## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

State of Minnesota, by and through its Minnesota Pollution Control Agency,

      Plaintiff,

      v.

3M Company and 3M Chemical Operations LLC,

      Defendants.

CASE NO. 0:26-cv-2440

## NOTICE OF REMOVAL

Defendant 3M Company ("3M"), by and through undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1331, 1367, 1441, 1442(a)(1), and 1446, from the District Court for the Tenth Judicial District, Washington County, Minnesota, to the United States District Court for the District of Minnesota, Third Division. As further detailed below, 3M is entitled to remove this case based on federal officer jurisdiction because it asserts claims related to 3M's production and testing of MilSpec AFFF at the direction of the United States military. In addition, 3M is entitled to remove this case based on federal question jurisdiction because Plaintiff asserts claims for violation of federal law or, alternatively, because at least one of Plaintiff's claims requires the adjudication of federal-law issues that are (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.

As grounds for removal, 3M alleges as follows on personal knowledge as to its own conduct and status and on information and belief as to all other matters:

## PRELIMINARY STATEMENT

1.     Plaintiff State of Minnesota, by and through its Minnesota Pollution Control Agency ("Plaintiff"), seeks to hold 3M and another Defendant liable based on their alleged conduct in manufacturing, disposing, discharging, and/or releasing of per- and polyfluoroalkyl substances ("PFAS"), including but not limited to perfluorooctane sulfonic acid ("PFOS") and PFAS-containing products.

2.     Plaintiff alleges that 3M and 3M Chemical Operations LLC manufactured, disposed, discharged, and/or released PFAS and/or PFAS-containing products at a facility located in Cottage Grove, Minnesota (the "Cottage Grove Facility").[1] (*See* Exhibit A, Compl. at 1, ¶¶ 43, 51, 61-93.) Plaintiff asserts that alleged discharges of PFAS resulting from 3M's manufacture, disposal, and/or release of PFAS and/or PFAS-containing products at the Cottage Grove Facility violates various federally authorized permit conditions and state and federal statutes. (*See id.* ¶¶ 94-146.) Plaintiff seeks injunctive relief, civil penalties, response costs, removal costs, natural resource damages, and other relief under Minn. Stat. § 115B.

---

[1] The Cottage Grove Facility has at times been known as the "Chemolite" or "Chemolite Siding" facility. See Exhibit D at 3M_AFFF_MDL03767672 (letter from Department of Navy noting change of plant identification from "Chemolite Siding" to "Cottage Grove," "which does not change the physical location of the plant."). In December 2022, 3M announced that it would exit all PFAS manufacturing— including at Cottage Grove—by the end of 2025, and it has completed that exit.

3.      One PFAS-containing product that 3M manufactured and that Plaintiff alleges was released at the Cottage Grove Facility was aqueous film-forming foams ("AFFF"), including AFFF that 3M manufactured in accordance with rigorous military specifications ("MilSpec") issued by the Department of Defense ("DoD") for use by the federal government. The alleged discharges that form the basis of Plaintiff's complaint relate at least in part to PFAS attributable to 3M's historical manufacture of PFAS-containing products at the Cottage Grove Facility, including 3M's manufacture of MilSpec AFFF. 3M is therefore entitled to remove this action as a whole to federal court based on federal officer jurisdiction under § 1442(a)(1).

4.      As to the alleged release of PFAS at issue in this case that plausibly relates to the manufacture of MilSpec AFFF, 3M intends to assert the federal "government contractor" defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). Under this defense, 3M is not subject to liability related to its manufacture and testing of MilSpec AFFF at Cottage Grove. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action in order to have its federal defense, and any factual disputes related to it, adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

## BACKGROUND

5.      On April 3, 2026, 3M agreed to waive service of the Complaint in this action. *See MCHS Red Wing v. Converse*, 961 N.W.2d 780, 784-85 (Minn. Ct. App. 2021) (discussing Minnesota practice of commencing an action without filing the complaint in court through a process colloquially referred to as "hip-pocket service").

6.      On May 1, 2026, 3M caused the complaint to be filed in the District Court for the Tenth Judicial District, Washington County, Minnesota. Plaintiff's Complaint is attached hereto as **Exhibit A**.

7.      Plaintiff claims to bring this action "to address [3M's] unlawful discharge of [PFAS] into ground and surface waters" from its Cottage Grove Facility and the manufacturing operations conducted there. Compl. at pp. 1-2. Plaintiff identifies several alleged sources of these discharges, including but not limited to stormwater runoff from the Cottage Grove Facility generally (*see, e.g.*, *id.* ¶ 64); the facility's fire training area (*see id.* ¶¶ 81, 101, 123-24); Solid Waste Management Unit 15 – Disposal Area D8 (*see id.* ¶ 90); its "East Cove" disposal area (*see*, ¶ 91); and its wastewater treatment plant area (*see id.*).

8.      Plaintiff asserts claims against 3M for purported violations of permit conditions, state rules, state statute, or federal statute (*id.* ¶¶ 94-121), enforcement of administrative order and state water quality laws (*id.* ¶¶ 122-128), and enforcement of the Minnesota Environmental Response and Liability Act for the release and threatened release of hazardous substances (*id.* ¶¶ 75-80).

4

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE MET

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 103(3) and 1441(a) because the District Court for the Tenth Judicial District, Washington County, Minnesota, is located in the District of Minnesota, Third Division.

10.      3M is not required to notify or obtain the consent of any other Defendant to remove this action as a whole under the federal officer removal statute. *See* 28 U.S.C. § 1446(b)(2)(A) (consent requirement applies only "[w]hen a civil action is removed solely under section 1441(a)"); *Bureau v. BASF Corp.*, No. CV 21-324-JWD-RLB, 2022 WL 807372, at *11–12 (M.D. La. Jan. 3, 2022), *report and recommendation adopted*, No. CV 21-324-JWD-RLB, 2022 WL 803599 (M.D. La. Mar. 14, 2022);*see also, e.g., Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *In re Fiorito Litig.*, No. 22-CV-0749 (PJS/TNL), 2022 WL 1448845, at *3 (D. Minn. May 9, 2022).[2]

11.      Pursuant to 28 U.S.C. § 1446(a), 3M has attached collectively as **Exhibit B** true and accurate copies of all process, pleadings, and orders served upon 3M in this action.[3]

12.      Removal is timely under 28 U.S.C. § 1446(b)(1), as 3M files this notice of removal within thirty days of its waiver of service of the initial pleading.

---

[2] Though unnecessary under the circumstances, the only other defendant named in this case, 3M Chemical Operations LLC, consents to removal.

[3] Although Plaintiff's Complaint references two documents purportedly attached as Exhibits A and B (*see* Compl. at p. 2 & ¶¶ 53, 74, 94), the referenced exhibits were omitted from the version of the Complaint served on 3M.

13. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon all parties to this action, and a copy is being filed with the Clerk of the District Court for the Tenth Judicial District, Washington County, Minnesota.

14. By filing a Notice of Removal in this matter, 3M does not waive the rights of any Defendant to object to personal jurisdiction or venue; and 3M specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

15. 3M reserves the right to amend or supplement this Notice of Removal.

16. If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

### REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

17. Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person acting under a federal officer"; (b) its actions were "for or relating to any act under color of such office," and (c) it can assert a "colorable" federal defense. *See Chevron USA Inc. v. Plaquemines Parish, Louisiana*, 608 U.S. ----, --- S. Ct. ----, 2026 WL 1040461, at *3 (Apr. 17, 2026) (internal quotations omitted); *see also Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012), *abrogated on other grounds by BP P.L.C. v. Mayor & City Council of Balt.*, 593 U.S. 230 (2021); *Mesa v. California*, 489 U.S. 121, 124-125, 129-131, 133-135 (1989);

6

*Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson*, 517 F.3d at 135; *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016).

18.    Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1)—an "exception to the well-pleaded complaint rule," *Graves v. 3M Co.*, 17 F.4th 764, 768 (8th Cir. 2021)—protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *see Durham*, 445 F.3d at 1252. To the contrary, § 1442 must be "liberally construed" in favor of removal, *Watson v. Philip Morris Co., Inc.*, 51 U.S. 142, 147 (2007), and "the typical presumption against removal does not apply." *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021).

19.    All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's alleged injuries are related to 3M's manufacture and testing of products, such as MilSpec AFFF, pursuant to a specification issued by the military. *See, e.g.*, *Cuomo*, 771 F.3d at 115-117 (reversing order remanding case to state court because the requirements of § 1442(a)(1) were met with respect to

allegedly defective product designed pursuant to military specifications); *Maine v. 3M Co.*, 159 F.4th 129, 138-140 (1st Cir. 2025) (holding that 3M met the requirements for federal officer removal where it alleged PFAS from MilSpec AFFF contributed to PFAS contamination alleged by state); *Nessel v. Chemguard, Inc.*, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in AFFF case against 3M and other manufacturers and holding that, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF[,] . . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against 3M and other manufacturers of MilSpec AFFF); *see also Jacks*, 701 F.3d at 1234 (federal officer removal is proper when the contractor "is helping the government to produce an item that it needs").

20.     The court overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation has found on multiple occasions that removal under § 1442 is proper where the notice of removal alleges that plaintiffs' claims for relief stem at least in part from MilSpec AFFF. *See, e.g.*, *In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *2-3 (D.S.C. May 24, 2019).[4] Courts also have held that the requirements

---

[4] Following removal, 3M intends to designate this action for transfer to the *In re AFFF Products Liability Litigation* MDL, where the Judicial Panel on Multidistrict Litigation ("JPML") has already transferred other PFAS cases related to releases from 3M's other facility where it produced MilSpec AFFF. *See* Transfer Order at 1-2, *In Re: Aqueous Film-Forming Foams Products Liability Litigation*, MDL. No. 2873, ECF No. 2679 (J.P.M.L. June 7, 2024); Transfer Order at 1, MDL. No. 2873, ECF No. 2797 (J.P.M.L. Aug. 1, 2024); Transfer Order, MDL. No. 2873, ECF No. 3166 (J.P.M.L. Dec. 12, 2024).

for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's claimed injuries at least in part plausibly stem from the disposal of waste related to products manufactured at the direction of the federal government. *See, e.g.*, *Albritton v. A Clemente, Inc.*, No. 1:22-cv-00397, 2023 WL 2447422, at *6 (D.N.J. Mar. 10, 2023); *Illinois ex rel. Raoul v. Monsanto Co.*, 2023 WL 130525, at *3-4 (N.D. Ill. Jan. 9, 2023); *N.J. Dep't of Env't Prot. v. E.I. Du Pont de Nemours & Co.,* 2020 WL 2611539, at *4-5 (D.N.J. May 22, 2020); Order at 7-8, *In re AFFF Prods. Liab. Litig.*, 2:18-mn-02873-RMG, ECF No. 8931 (D.S.C. Mar. 17, 2026). 3M's right to a federal forum is even stronger here, because not only did 3M manufacture MilSpec AFFF at Cottage Grove, it also tested the product at Cottage Grove pursuant to the direction of the United States Navy. Accordingly, this case is properly removed to this Court.

A.    **MilSpec AFFF**

21.    In the late 1960s/early 1970s, the United States military began using MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the United States Naval Research Laboratory developed AFFF—its researchers were granted an AFFF-related patent in 1966.[5] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[6]

---

[5] *See* U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[6] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the

22. The design, manufacture, and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command, part of the DoD. The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[7] All MilSpec AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[8] Listing requires a "manufacturer's . . . products [to be] examined, tested, and approved to be in conformance with specification requirements."[9] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.[10] After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[11] Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[12]

---

Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[7] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[8] MIL-PRF-24385F(4) § 3.1 (2020).

[9] DOD, SD-6, Provisions Governing Qualification at 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[10] *See, e.g.*, MIL-PRF-24385F(4) at 18 (2020). The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity." The "Preparing Activity" is responsible for qualification. (*See* DOD SD-6, *supra* n. 9, at 3.)

[11] DOD, SD-6, *supra* n. 9, at 1.

[12] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

23.     From its inception until 2019, the MilSpec for AFFF included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their precursors— among the compounds expressly alleged to be at issue in the Complaint here.[13] The current MilSpec expressly contemplates the presence of PFOA and PFOS (subject to recently imposed limits) in AFFF formulations.[14] Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS from AFFF "while still meeting all other military specification requirements."[15]

24.     Plaintiff seeks to hold 3M liable for releases of PFAS from 3M's Cottage Grove Facility, where the Complaint alleges that 3M manufactured and used PFAS including PFOS and PFOA. *See, e.g.*, Compl. ¶¶ 43, 51, 61-93. One of the PFAS-containing[16] products that 3M manufactured at its Cottage Grove Facility was AFFF that 3M manufactured and tested in accordance with rigorous military specifications ("MilSpec") issued by the DoD and for use by the federal government.

---

[13] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

[14] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[15] *Id.* § 6.6.

[16] Several of 3M's MilSpec AFFF products manufactured at the Cottage Grove Facility contained PFOS in particular.

25.     3M's manufacture of MilSpec AFFF at the Cottage Grove Facility is evidenced by a compilation of letters the U.S. Navy sent to 3M from 1971 to 1991 (collectively attached hereto as **Exhibit C**), which specifically approved the qualification of certain 3M AFFF products manufactured at 3M's Cottage Grove Facility under MIL-F-24385. *See* Ex. C at 3M_AFFF_MDL02153894 (March 1971 Naval Ship Engineering Center letter confirming conformance of 3M's "aqueous film forming foam manufactured at Chemolite Siding, Minnesota[17] with the requirements of Military Specification MIL-F-24385 (SHIPS)"); *id.* at 3M_BELL03090254-56 (January 1972 Naval Ship Engineering Center letter confirming MilSpec conformance of AFFF manufactured by 3M at "Chemolite Siding, Minnesota"); *id.* at 3M_AFFF_MDL01605340 (May 1974 Naval Ship Engineering Center letter confirming MilSpec conformance of AFFF manufactured by 3M at "Chemolite Siding, MN"); *id.* at 3M_BELL03090277-79 (July 1974 Naval Ship Engineering Center letter confirming MilSpec conformance of AFFF manufactured by 3M at "Chemolite Siding, MN"); *id.* at 3M_BELL03090235 (June 1978 Department of the Navy letter extending MilSpec qualification approval to a product manufactured by 3M at the Chemolite Siding plant); *id.* at 3M_BELL02725832 (April 1979 Department of the Navy letter confirming MilSpec conformance of AFFF manufactured by 3M at "Chemolite Siding, Minnesota"); *id.* at 3M_BELL03090220-21 (September 1982 Department of the Navy letter extending MilSpec AFFF qualification approval to two AFFF products manufactured at the Chemolite Siding plant); *id.* at 3M_BELL02723105-06 (May 1984

---

[17] As noted above, *see supra* n.1, the Cottage Grove Facility was previously known as Chemolite Sliding.

Department of the Navy letter extending MilSpec qualification approval to a product manufactured by 3M at the Chemolite Siding plant); *id.* at 3M_AFFF_MDL03767672 (August 1988 letter from Department of Navy noting change of plant identification on MilSpec AFFF Qualified Product List from "Chemolite Siding" to "Cottage Grove," "which does not change the physical location of the plant."); *id.* at 3M_BELL00000526-27 (June 1991 Department of the Navy letter confirming MilSpec conformance of AFFF manufactured by 3M at "19 Cottage Grove (Washington), Minnesota").

26.     Of particular relevance to Plaintiff's allegations relating to 3M's fire training area (Compl. ¶¶ 81, 101, 123-24), additional documentation also confirms that, with Plaintiff's awareness and approval, 3M conducted qualification and/or conformance testing required by the AFFF MilSpec at the Cottage Grove Facility dating back to the late 1960s and early 1970s. *See* Exhibit D at 3M_GU00223580-82 (December 1969 letter from 3M to Plaintiff describing MilSpec AFFF testing requirements and the frequency of testing performed in 1968 and 1969); *id.* at 3M_AFFF_MDL00453940 (February 1972 newspaper article describing Plaintiff's approval of 3M's request for variance to allow outside burning to test AFFF, noting that "3M has been working under a Navy contract to product what it calls a 'light water'[18] agent for controlling petroleum fires" and "[t]he contract calls for extensive testing of each batch of the product."). As explained in 3M's correspondence to

---

[18] AFFF was originally referred to as "light water" because the PFAS surfactants in AFFF enable the aqueous mixture to remain on the surface of liquid hydrocarbon fuels, whereas ordinary water would sink and leave the fuel exposed to oxygen in the air. 3M later trademarked "Light Water," and the term AFFF was adopted to describe the product more generally.

13

Plaintiff, 3M's AFFF testing at the Cottage Grove Facility was required by the MilSpec, which mandated, among other things, both quality assurance testing of each lot manufactured by 3M and product qualification testing. *Id* at 3M_GU00223581. The testing required by the MilSpec included the use of AFFF to extinguish a liquid-fuel based fire following a detailed testing protocol established by the Navy. *See id.*; *see also* Mil-F-24385 §§ 4.1, 4.3, 4.4, 4.7.8-4.7.10.4.3 (1969), n. 7 *supra*.

27.     During at least part of the time when 3M manufactured MilSpec AFFF at the Cottage Grove Facility, 3M manufacturing process wastes (including wastes from the production of MilSpec AFFF, which contained PFAS) were disposed of at the Cottage Grove Facility, where Plaintiff now contends PFAS are discharged at multiple sampling locations related to former disposal areas. *See, e.g., id*. ¶¶ 45, 75-77, 91. And Plaintiff specifically asserts claims related to PFAS releases from a fire training area where 3M conducted testing of its MilSpec AFFF products. *See id.* ¶¶ 81, 101, 123-24. As a result, the alleged PFAS discharges from the disposal areas identified by the State contain PFAS from 3M's production and/or testing of MilSpec AFFF, which is chemically indistinguishable from many of the PFAS (including but not limited to PFOS) contained in 3M's manufacturing process wastes from its production of other PFAS and PFAS-containing products at the Cottage Grove Facility.

28.     Plaintiff's allegations of PFAS discharges from the Cottage Grove Facility therefore relate at least in part to 3M's manufacture and/or testing of MilSpec AFFF at its Cottage Grove Facility. PFAS releases at the Cottage Grove Facility are at least partly attributable to 3M's manufacture, testing, and/or disposal of MilSpec AFFF. And because

these MilSpec products were required by DoD to contain PFAS, 3M is entitled to remove this case as a whole under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). As shown below, and as multiple federal courts have confirmed, all the elements of federal officer jurisdiction are met when a plaintiff seeks relief for alleged contamination that is related to MilSpec AFFF products. *See, e.g., Maine v. 3M Co.*, 159 F.4th 129, 138-140 (1st Cir. 2025); Order, *In re AFFF Prods. Liab. Litig.*, 2:18-mn-02873-RMG, ECF No. 8931 (D.S.C. Mar. 17, 2026).

**B**      **All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied**

*1. 3M is a "Person" That "Act[ed] Under" A Federal Officer*

29.      The first requirement ("acting under" a federal officer) is satisfied when a "person" assists or helps carry out the duties or tasks of a federal officer. *Watson*, 551 U.S. at 152; *Papp*, 842 F.3d at 812. To begin, 3M (a corporation) is plainly a "person" under the statute.[19] And the phrase "acting under" is to be "liberally construed in favor of the entity seeking removal." *Sawyer*, 860 F.3d at 255 (internal quotation marks omitted). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813; *accord Plaquemines*, 608 U.S. ----, 2026 WL 1040461, at *8 (rejecting similar argument as improperly conflating the "acting under" requirement with the requirement that the defendant's conduct must "relat[e] to" an "act

---

[19] *See* 1 U.S.C. § 1 ("the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals").

under color of federal office"). Rather, "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it manufactured for the government." *Sawyer*, 860 F.3d at 255.

30.     The requirement of "acting under" a federal officer is met here because the PFAS discharges alleged in the Complaint stem in part from 3M's manufacture and/or testing at the Cottage Grove Facility of MilSpec AFFF, a vital product that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137; *Jacks*, 701 F.3d at 1234 ("acting under" requirement satisfied where "a private contractor … [was] helping the government to produce an item that it needs"); *see also Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "lifesaving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations" and that 3M "contributed considerably to the success of the development of AFFF."[20] Accordingly, the military has long depended upon outside contractors like 3M to develop and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *accord In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *2; *Ayo*, 2018 WL 4781145, at *8-9.

---

[20] Fulfilling the Roosevelts' Vision, *supra* n. 6, at 37.

16

31.     In designing, manufacturing, supplying, and/or testing the MilSpec AFFF at issue, 3M acted under the direction and control of one or more federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, MilSpec AFFF products were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[21]

32.     For these reasons, 3M has satisfied the "acting under" requirement. *See In re AFFF,* 2019 WL 2807266, at *2 (finding that "acting under" requirement was satisfied because defendant demonstrated that it manufactured MilSpec AFFF under guidance of U.S. military); *Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same).

### 2. The "For or Relating to Any Act Under Color Of Federal Office" Requirement Is Satisfied

33.     The second requirement, that the defendant's actions were taken "for *or relating to* any act under color of federal office," 28 U.S.C. § 1442(a)(1) (emphasis added), requires only a "connection that is not 'tenuous, remote, or peripheral'" between the plaintiff's claims or injuries and the defendant's acts undertaken at the direction of a federal officer. *Plaquemines*, 608 U.S. ----, 2026 WL 1040461, at *6. As with the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at

---

[21] *See* Dep't of Defense, SD-6, *supra* n. 9, at 1.

137. Given that the phrase "'relating to' sweeps broadly," and is satisfied by even an "indirect" connection, "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Plaquemines*, 608 U.S. ----, 2026 WL 1040461, at *6 (finding this factor satisfied notwithstanding that the defendant's federal contract did not "expressly direct or invite" the challenged conduct).[22] To meet this requirement, "there need be only *a connection or association* between the act in question and the federal office." *Sawyer*, 860 F.3d at 258; *Papp*, 842 F.3d at 813; *Isaacson*, 517 F.3d at 137–38 (explaining that it is sufficient if the act that allegedly caused the plaintiff's injuries occurred while the defendant was performing its official duties).

34.     Here, Plaintiff's claims and requests for relief plausibly arise at least in part from 3M's manufacture and/or testing of products for which the applicable MilSpec required the use of PFAS to meet the Government's needs. As a result, Plaintiff's suit is "for or relating to" 3M's acts taken under color of federal office. 28 U.S.C. § 1442(a)(1); *see, e.g.*, *Albritton*, 2023 WL 2447422, at *6 (holding that claims against DuPont to recover for alleged PFAS contamination resulting from waste disposals connected to manufacture

---

[22] To the extent earlier Eighth Circuit decisions have characterized this factor as requiring a "causal connection" between the defendant's conduct and its federal duties, *see, e.g., Graves*, 17 F.4th at 769; *Doe v. BJC Health Sys.*, 89 F.4th 1037, 1041 (8th Cir. 2023), that requirement has now been expressly set aside by the Supreme Court. *See Plaquemines*, 2026 WL 1040461, at *6 (explaining that the statute does not require a "strict causal relationship" but only "a connection that is not tenuous, remote, or peripheral"). As the Supreme Court explained, its prior case law requiring a "causal connection" or a "nexus" between federal authority and the challenged conduct was based on its interpretation of the pre-2011 statute, which did not include the "relating to" statutory language. *Id*. at *6 n.3. Congress's addition of that language "broadened the statute." *Id*.

18

of products for the government during World War II sufficiently related to DuPont's acts under federal office); *Monsanto Co.*, 2023 WL 130525, at *3 (holding that claims to recover for alleged contamination resulting from waste disposals connected to manufacture of products pursuant to military specifications were sufficiently related to acts under color of federal office because Congress's 2011 amendment of § 1442(a)(1) "broadened the federal officer removal statute to include actions 'not just causally connected, but alternatively connected or associated with acts under color of federal office'" (quoting *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 943 (7th Cir. 2020))); Order at 5-8, *In re AFFF Prods. Liab. Litig.*, 2:18-mn-02873-RMG, ECF No. 8931 (D.S.C. Mar. 17, 2026) ("3M's alleged *disposal* of PFAS-contaminated waste from the Decatur facility necessarily flows from, or is intrinsic to, its *production* of MilSpec AFFF at the Decatur facility.").

35. Courts "credit Defendants' theory of the case" when determining whether the requisite connection exists. *Isaacson*, 517 F.3d at 137 (citing *Acker*, 527 U.S. at 432); *see Maryland v. 3M Co.*, 130 F.4th 380, 389 (4th Cir. 2025), *cert. denied,* No. 25-517, 2026 WL 568301 (U.S. Mar. 2, 2026); *Express Scripts, Inc.*, 119 F.4th at 192; *Nessel*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present"). As averred in this Notice of Removal, Plaintiff's alleged injuries plausibly arise at least in part from MilSpec AFFF. Plaintiff's claims thus sufficiently relate to 3M's actions under color of federal office. "[I]t is enough for . . . removal that at least some of the pollution arose from the federal acts." *Baker*, 962 F.3d at 943.

19

### 3. The "Colorable Federal Defense" Requirement Is Satisfied

36.   The third requirement ("colorable federal defense") is satisfied by 3M's assertion of the government contractor defense under *Boyle*, 487 U.S. at 512.

37.   At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original). "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Graves,* 17 F.4th 764, 771 (*"For a defense to be considered colorable, it need only be plausible; § 1442(a)(1) does not require a court to hold that a defense will be successful before removal is appropriate.")* (quoting *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001)). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116.[23] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783-84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original); *see also Maine*, 159 F.4th

---

[23] *See also Kraus v. Alcatel-Lucent*, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.").

at 138 ("We must credit 3M's theory" that the complained of PFAS contamination included "contamination from sources for which 3M admittedly has a federal contractor defense.").

38.     Here, Plaintiff seeks to impose liability and seeks relief under state law for alleged PFAS contamination, including PFAS contamination stemming from the manufacture, disposal, and testing of MilSpec AFFF. *Boyle* displaces state law where, as here, "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

39.     3M has pleaded the elements of a plausible government contractor defense for purposes of removal. The requirement of "reasonably precise specifications" can be met by allegations showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not a mere "rubber stamping." It created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling. Those specifications are "reasonably precise," including in requiring the use of PFAS. In addition, in the past and continuing to the present, the DoD has purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. *See Ayo*, 2018

WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

40. With respect to the second requirement, 3M's products have appeared on the DoD Qualified Products List,[24] which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); *In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *2 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

41. Regarding the third requirement, the government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human

---

[24] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014); MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (both available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

health issues.[25] For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire fighting exercises are considered to have adverse effects environmentally."[26] In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil contamination" and the "potential" for "groundwater contamination."[27] By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent." In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer. More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing

---

[25] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1-6 (Nov. 4, 2002) (excerpt).

[26] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[27] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

petroleum-based fires."[28] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[29] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); *In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *3 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . "); *Albritton*, 2023 WL 2447422, at *8 (holding that defendant asserted colorable government contractor defense for claims related to disposal of product manufactured pursuant to federal government specifications and contracts).

42.     At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See*

---

[28] Dep't of Defense, *Aqueous Film Forming Foam Report to Congress* 1-2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[29] *See* MIL-PRF-24385F(SH), Amendment 4, § 6.6 & Tables I, III (2020), https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=17270; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

*Twinam v. Dow Chem. Co. (In re "Agent Orange" Prod. Liab. Litig.*), 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

43.    3M's use of PFAS in MilSpec AFFF was "governed by rigorous specifications administered by the Department of Defense." *Maryland*, 130 F.4th at 385. By seeking to impose liability on 3M for conduct related to 3M's compliance with military specifications, Plaintiff is attempting to use state law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

44.    In the multidistrict litigation established in 2018 to manage federal litigation related to AFFF, the MDL court has found based on an extensive factual record that the government contractor defense asserted by 3M and other defendants presents genuine issues of fact for trial. *See In re AFFF Prods. Liab. Litig.*, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues is by definition better than merely "colorable." *See* Order at 5-8, *In re AFFF Prods. Liab. Litig.*, 2:18-mn-02873-RMG, ECF No. 8931 (D.S.C. Mar. 17, 2026) (denying remand motions and rejecting argument 3M's government contractor defense related to its production of MilSpec AFFF at its Decatur, Alabama facility was not colorable).

## IN ADDITION, REMOVAL IS PROPER BASED ON FEDERAL QUESTION JURISDICTION

45.    In addition, the United States District Court for the District of Minnesota has original jurisdiction over certain of Plaintiff's claims under 28 U.S.C. § 1331, and the exercise of supplemental jurisdiction as to the remaining claims is proper under 28 U.S.C. § 1367.

46.    The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because the Complaint asserts a claim for "Violations of … Federal Statute Enforceable by the State" and asserts that 3M violated specific Code of Federal Regulation provisions.  *See* Compl. p. 23 (Count I) & ¶¶ 105, 106. *See Lundeen v. Canadian Pac. Ry. Co.,* 342 F. Supp. 2d 826, 831 (D. Minn. 2004) (finding federal question jurisdiction proper where "on the face of their Complaint," the plaintiffs "allege a violation of federal environmental law as a cause of action in its own right," and not merely "as an element of a state cause of action").

47.    Even if the Complaint did not plead a violation of federal law on its face (and it does), this Court still has original federal-question jurisdiction under 28 U.S.C. § 1331 because at least one of Plaintiff's claims requires the adjudication of federal-law issues that are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)).

26

48.     The State's claims under Count I "necessarily raise" questions of federal law. *Gunn*, 568 U.S. at 258. In fact, the State's claims are "unquestionably premised on duties established by federal law." *Minnesota v. Fleet Farm LLC*, 679 F. Supp. 3d 825, 837 (D. Minn. 2023).

49.     The State alleges that 3M "violated" a federal regulation—40 C.F.R. § 122.41—"when applying for reissuance of Permit #MN001449 in 2007 by failing to disclose its knowledge" that certain PFAS compounds "were present in its discharge to waters." Compl. ¶ 98. That federal regulation imposes conditions on all NPDES permits nationwide, requiring permit applicants to disclose "any information the [State] may request to determine whether cause exists for . . . reissuing" a permit and to "promptly submit" any "relevant facts" omitted from a permit application. 40 C.F.R. § 122.41(h), (l)(8). Thus, whether the presence of certain PFAS compounds were "relevant facts" that 3M was "aware" it had failed to submit is squarely a question of federal law, namely the proper interpretation of section 122.41(l)(8) and what it requires.

50.     The State also alleges that 3M "violated" another "Federal Regulation" on "each day" 3M allegedly failed "to properly calibrate its pH meter" or "conform with temperatures or holding times" when conducting testing. Compl. ¶¶105-06 (citing 40 C.F.R. § 136.3). Section 136.3 prescribes detailed requirements for each of those parameters. Here, too, the Court cannot adjudicate the State's allegations without interpreting and applying federal law. *See* 40 C.F.R. § 122.41(j)(4); *see also*, *e.g.*, *Ohio Valley Env't Coal. v. Miano*, 66 F. Supp. 2d 805, 807 (S.D.W. Va. 1998) (state-law claim

27

"arises under federal law inasmuch as [it] . . . turns squarely on the construction of . . . the Clean Water Act" and implementing regulations).

51.     3M and the State "actually dispute[]" whether 3M is in noncompliance with federal law and whether there is any relief the court could grant in this matter. *Gunn*, 568 U.S. at 259. 3M disputes the State's account that 3M is in violation of what the applicable federal statute and regulations require. For example, 3M disputes the State's allegations that 3M is in noncompliance with a Notice of Violation issued by MPCA on January 22, 2021 "detailing several violations of permit conditions, regulatory rules, and federal . . . statutes." *See* Compl. at p. 2 & ¶ 94-95. Moreover, 3M disputes that it is in noncompliance with sections 40 C.F.R. § 122.41 and 40 C.F.R. § 136.3 (*see* Compl. ¶¶ 98, 105-107) and, thus, the interpretation and application of federal regulatory requirements.

52.     These federal issues are "substantial." *Gunn*, 568 U.S. at 259. The interpretation of NPDES permitting regulations has nationwide implications: Both sections 122.41 and 136.3 apply to every NPDES permit in the country and mandate exact EPA-approved analytical methods for every monitored parameter. Thus, "[r]esolution of this dispute" over the scope of these regulations "would control the outcome in numerous other cases." *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009). And that means there is an acute need for "uniformity," *Gunn*, 568 U.S. at 261, and "a consistent, nationwide approach" in applying these federal standards, *Fleet Farm*, 679 F.Supp.3d at 838. Where, as here, "the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial

28

federal interest, justifying the exercise of jurisdiction by federal courts." *Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 807 (4th Cir. 1996).

53.     Far from "disrupting the federal-state balance approved by Congress," *Gunn*, 568 U.S. at 258, this Court's exercise of jurisdiction would vindicate it.  These regulations are enforceable in federal court, 33 U.S.C. § 1365, demonstrating that they are not merely "established at the federal level," but appropriately litigated in a federal forum, too.  *Fleet Farm*, 679 F. Supp. 3d at 839; *see also Frilling v. Village of Anna*, 924 F. Supp. 821, 843–44 (S.D. Ohio 1996) (treating state-issued NPDES permit limitations as federal standards with independent federal legal force). After all, the interpretation and application of federal regulations is not "an area of concern traditionally reserved to the states." *Christopherson v. Bushner*, 2021 WL 1692151, at *12 (W.D. Mo. Apr. 29, 2021), *aff'd*, 33 F.4th 495 (8th Cir. 2022). Accordingly, this Court "may resolve the central issues in this case without disturbing the federal-state balance." *Fleet Farm*, 679 F. Supp. 3d at 839.

54.     A defendant may remove any state court action over which a district court would have original jurisdiction to the district court of the United States for the district and division embracing the place where such action is pending. 28 U.S.C. § 1441(a). A district court has original jurisdiction over all civil actions arising under the laws of the United States. 28 U.S.C. § 1331.

55.      Because there is original jurisdiction and federal-question jurisdiction in the United States District Court for the District of Minnesota, this Court also has jurisdiction pursuant to 28 U.S.C. § 1331 and removal is proper.

29

56.     Further, although some of Plaintiff's claims arose under state law, those claims arise out of the same facts as its federal-law claims, enabling this Court to exercise supplemental jurisdiction over those claims under 28 U.S.C § 1367.

57.     "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A single case or controversy exists for these purposes whenever the state and federal claims arise from a "common nucleus of operative fact[s]" such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

58.     All of Plaintiff's claims arise out of the same set of facts, namely, the alleged discharge of PFAS from the Cottage Grove Facility, and thus are part of the same case or controversy. This Court's exercise of supplemental jurisdiction is not inconsistent with the considerations set forth in 28 U.S.C. § 1367(c), as deciding a dispute under federal law is necessary to ruling on Plaintiff's claims.

WHEREFORE, 3M hereby removes this action from the District Court for the Tenth Judicial District, Washington County, Minnesota, to this Court.

Dated: May 1, 2026 **FAEGRE DRINKER BIDDLE & REATH LLP**


 */s/ Christopher H. Dolan*
Christopher H. Dolan (#0386484)
Frances M. Daniels (#0403829)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Phone: 612.766.7000
chris.dolan@faegredrinker.com
fran.daniels@faegredrinker.com


***Attorneys for Defendant 3M Company***

31

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on May 1, 2026, Defendant 3M Company caused to be served the Complaint, Summons, and Waiver via U.S. Certified Mail at: The Office of Minnesota Attorney General Keith Ellison, c/o Peter N. Surdo, Special Assistant Attorney General, 445 Minnesota Street, Suite 600, St. Paul, Minnesota 55101. Courtesy copies were also sent via electronic mail to peter.surdo@ag.state.mn.us.

Dated: May 1, 2026

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Christopher H. Dolan*
Christopher H. Dolan (#0386484)
Frances M. Daniels (#0403829)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Phone: 612.766.7000
chris.dolan@faegredrinker.com
fran.daniels@faegredrinker.com

***Attorneys for Defendant 3M Company***

32