# EXHIBIT A

STATE OF MINNESOTA

COUNTY OF WASHINGTON

DISTRICT COURT

TENTH JUDICIAL DISTRICT

Case Type: Civil Other/Misc.
Court File No. _____

State of Minnesota, by and through its Minnesota Pollution Control Agency

Plaintiff,

vs.

3M Company and

3M Chemical Operations LLC

Defendants.

**COMPLAINT**

This is an action by Plaintiff, State of Minnesota by and through the Minnesota Pollution Control Agency ("MPCA"), against Defendants, 3M Company and 3M Chemical Operations LLC (collectively, "3M"), to address its unlawful discharge of per- and polyfluoroalkyl substances (PFAS) into ground and surface waters.

3M owns and operates a chemical manufacturing facility located in Cottage Grove, Washinton County, Minnesota (the "Facility"). At the Facility, 3M manufactured products including, but not limited to, PFAS, adhesive products, specialty paper, industrial polymers, abrasives, and reflective road sign materials.

PFAS, or per- and polyfluoroalkyl substances, are a large family of human-made chemicals known for their extreme environmental persistence and tendency to accumulate in water, soil, wildlife, and the human body. They are sometimes called "forever chemicals" because they do not break down naturally and readily migrate through groundwater and surface-water systems. Exposure to PFAS is associated with a range of

1

harmful health effects, including liver damage, altered cholesterol levels, thyroid disease, immune system impacts, decreased fertility, pregnancy-induced hypertension, and reduced birth weight. Because PFAS persist indefinitely, bioaccumulate in people and wildlife, and are detected in drinking water, fish, and other natural resources, it is essential that releases are identified, controlled, and remediated to protect human health and the environment.

3M's operations at the Facility are subject to several permits, permit conditions, rules, and statutes that MPCA administers and enforces. By its operations at the Facility, 3M violated numerous such standards and laws, and some of the violations are continuing to the present day.

In 2020, 3M told MPCA that it was aware of a previously undisclosed discharge of chemical constituents from the Facility. In response, MPCA issued two requests for information dated March 5, 2020, and July 1, 2020. 3M responded to the former on April 4, 2020 and the latter on a rolling basis thereafter.

Based on the information received, MPCA issued a Notice of Violation on January 22, 2021, detailing several violations of 3M's permit conditions, regulatory rules, and federal and state statutes. A copy of the Notice of Violation is attached to this Complaint as **Exhibit A**.

On December 14, 2022, MPCA issued an Administrative Order to 3M pursuant to Minn. Stat. 115.03. The Administrative Order required 3M to take certain remedial actions to address PFAS discharges from the Cottage Grove site. A copy of the Administrative Order is attached to this Complaint as **Exhibit B**.

2

Although 3M continues to implement the responses and remedies required in both the Notice of Violation and Administrative Order, that work remains incomplete and is now behind schedule.

This action is intended to address the unlawful discharges by 3M, including those identified in MPCA's Notice of Violation and Administrative Order according to Minn. Stat §§ 115, 116, and 115B, and seeks civil penalties, injunctive and affirmative relief including remedial actions, and damages.

MPCA, for its Complaint against Defendants, hereby states and alleges as follows:

**PARTIES**

1. MPCA is an executive agency of the State bearing the authority and responsibility to enforce the state's water quality and water permitting regulations. Minn. Stat. §§ 115.03, 115.44, 115.071, 116.07; Minn. R. 7001.1400 to .1470, 7041, 7050, 7052, 7053, and 7060.

2. Defendant 3M Company is a foreign Business Corporation registered in the state of Delaware with a registered agent in Roseville, Minnesota, and its principal offices at 3M Center, St. Paul, Minnesota 55144-1000.

3. Defendant 3M Chemical Operations LLC is a Foreign Business Corporation registered in the state of Delaware with a registered agent in Roseville, Minnesota, and its principal offices at 3M Center, St. Paul, Minnesota 55144-1001.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction to enforce the environmental laws of the state, including Chapters 115, 115B, and 116.

5.      Venue is proper in Washington County per Minn. Stat. § 542.09 because the Facility is located in Washington County.

## REGULATORY BACKGROUND

6.      The Minnesota Water Pollution Control Act, Minn. Stat. § 115.01 et seq., authorizes the MPCA to administer and enforce all laws relating to the pollution of any waters of the state. Minn. Stat. § 115.03, subd. 1(a).

7.      Minnesota Rules part 7050.0210 and part 7060.0600 fall under the MPCA's authority per the Minnesota Water Pollution Control Act.

8.      Minnesota Rules part 7050.0210 sets forth general standards for waters of the state; subpart 2 prohibits nuisance conditions:

Nuisance conditions prohibited. No sewage, industrial waste, or other wastes shall be discharged from either point or nonpoint sources into any waters of the state so as to cause any nuisance conditions, such as the presence of significant amounts of floating solids, scum, visible oil film, excessive suspended solids, material discoloration, obnoxious odors, gas ebullition, deleterious sludge deposits, undesirable slimes or fungus growths, aquatic habitat degradation, excessive growths of aquatic plants, or other offensive or harmful effects.

9.      Minnesota Rules part 7050.0210, subpart 13, prohibits pollution such that:

No sewage, industrial waste, or other wastes shall be discharged from either a point source or a nonpoint source into the waters of the state in such quantity or in such manner alone or in combination with other substances as to cause pollution as defined by law.

…

4

The quality of any waters of the state receiving sewage, industrial waste, or other waste effluents shall be such that no violation of the standards of any waters of the state in other class shall occur by reason of the discharge of the sewage, industrial waste, or other waste effluents.

10.     Minnesota Rules part 7060.0600 sets forth general standards for water quality standards in that state; subpart 2 prohibits certain discharges into the unsaturated zone:

No sewage, industrial waste, other waste, or other shall be allowed to be discharged to the unsaturated zone or deposited in such place, manner, or quantity that the effluent or residue therefrom, upon reaching the water table, may actually or potentially preclude or limit the use of the underground waters as a potable water supply, nor shall any such discharge or deposit be allowed which may pollute the underground waters. All such possible sources of pollutants shall be monitored at the discharger's expense as directed by the agency.

11.     Minn. Stat. 115.071, subd. 1, provides for the enforcement of laws directed to the prevention, control, or abatement of pollution, which may be enforced by any one or any combination of the following: criminal prosecution; action to recover civil penalties; injunction; action to compel or cease performance; or other appropriate action, in accordance with statute.

12.     In addition to its authority under the Minnesota Water Pollution Control Act, the MPCA is also vested with broad remedial, investigatory, and enforcement authority under the Minnesota Environmental Response and Liability Act ("MERLA"), Minn. Stat. §115B. MERLA authorizes MPCA to investigate releases or threatened releases of hazardous substances, pollutants, or contaminants; to require response actions necessary to protect public health or the environment; and to undertake or order removal, remedial,

5

and corrective actions at sites where such releases have occurred. Minn. Stat. §§ 115B.02, 115B.17.

13. Under Minn. Stat. § 115B.17, subd. 1–6, MPCA may issue orders requiring responsible persons to take response actions, may enter into and enforce response action agreements, and may recover all response costs incurred by the State in addressing a release or threatened release of hazardous substances. MERLA further authorizes MPCA, in coordination with the Attorney General, to seek judicial relief to enforce response orders, compel completion of required remedial work, and recover civil penalties for noncompliance.

14. MERLA also provides the State with the authority to recover damages for injury to, destruction of, or loss of natural resources, together with the reasonable costs of assessing such injury, as set forth in Minn. Stat. § 115B.17, subd. 7. This includes damages necessary to restore, rehabilitate, replace, or otherwise compensate for injured natural resources resulting from a release of hazardous substances, pollutants, or contaminants.

15. PFAS compounds constitute "hazardous substances," "pollutants," or "contaminants" within the meaning of MERLA. Minn. Stat. § 115B.02, subd. 8 (definition of "hazardous substance" referencing hazardous waste or federal designation); Minn. Stat. § 115B.02, subd. 9 (definition of "hazardous waste" referencing state or federal designation); § 116.06, subd. 11 (definition of "hazardous waste" as substances that pose a substantial present or potential hazard to human health or the environment when improperly disposed of or otherwise managed); *see also* 42 U.S.C. § 9602 (federal designation of perfluorooctanesulfonic acid (PFOS) and perfluorooctanoic acid (PFOA)

6

as hazardous substances for the purposes of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)).

16.    PFAS are human-made chemicals known for their extreme environmental persistence and tendency to accumulate in water, soil, wildlife, and the human body. They are sometimes called "forever chemicals" because they do not break down naturally and readily migrate through groundwater and surface-water systems. Exposure to PFAS is associated with a range of harmful health effects, including liver damage, altered cholesterol levels, thyroid disease, immune system impacts, decreased fertility, pregnancy-induced hypertension, and reduced birth weight. Because PFAS persist indefinitely, bioaccumulate in people and wildlife, and are detected in drinking water, fish, and other natural resources, it is essential that releases are identified, controlled, and remediated to protect human health and the environment.

17.    The federal Environmental Protection Agency has designated certain PFAS, including PFOS, as hazardous substances under the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).

18.    PFAS is a hazardous waste under applicable Minnesota law.

19.    Per Minn Stat. 115A.03, subd. 13a: "'Industrial waste' means solid waste resulting from an industrial, manufacturing, service, or commercial activity that is managed as a separate waste stream."

20.    PFAS is an industrial waste under applicable Minnesota law.

21.    Accordingly, MPCA possesses full statutory authority under Minn. Stat. § 115B to investigate PFAS contamination at and emanating from the Facility, to require

and enforce response actions to address that contamination, and to pursue all corresponding relief available under MERLA in addition to the remedies provided under Minn. Stat. § 115.

**THE MISSISSIPPI RIVER AND THE FACILITY'S DISCHARGES**

22. The Mississippi River is listed as an impaired water under Section 303(d) of the federal Clean Water Act.

23. "Pool 2" of the Mississippi River is immediately adjacent to the Facility, and the Facility discharges its industrial wastewater and stormwater into Pool 2.

24. Pool 2 has had a PFOS 303(d) impairment listing for fish tissue since 2008 and for ambient water quality since 2014.

25. MPCA has developed site-specific water quality criteria for application in the Mississippi River, Pool 2, of 0.05 parts per trillion (ppt) for PFOS.

26. MPCA has developed site-specific water quality criteria for application in the Mississippi River, Miles 820 to 812, of 0.027 ppt for PFOS.

27. The Minnesota Department of Health has issued a fish consumption advisory for certain fish caught in Pool 2 of the Mississippi River because of the presence of PFOS in fish.

28. The Facility is located along and abuts the Pool 2 segment of the Mississippi River.

29. The Facility contains at least 47 separate industrial and stormwater outfalls that discharge into the Mississippi River.

30.    The Facility is also situated on land with an unnamed stream that receives discharges from the Facility and carries them into the Mississippi River.

### 3M'S NPDES/SDS INDUSTRIAL WASTEWATER & INDUSTRIAL STORMWATER PERMITS FOR THE FACLIITY

31.    The federal Environmental Protection Agency authorizes MPCA to administer the NPDES permitting program for industrial wastewater and related stormwater discharges.

32.    3M operates the Facility subject to a National Pollutant Discharge Elimination System (NPDES) and State Disposal System (SDS) Permit wastewater permit uniquely identified as MN0001449, which was most recently reissued on June 1, 2025 (hereinafter, the "3M NPDES/SDS Permit").

33.    This Industrial Stormwater Permit governs 3M's operation of the Facility as to discharge of pollution via industrial wastewater streams and stormwater runoff and outfalls from the Facility site.

34.    Per the 3M Industrial Stormwater Permit, 3M developed a Stormwater Pollution Prevention Plan Program ("SWPPP"), which was most recently revised in September 2021.

35.    Per the 3M NPDES/SDS Permit at Chapter 1 (Surface Discharge Requirements – General) Part 1 (Special Requirements):

1.14: Any basins used for the purpose of fire training, or collection of fire training runoff wastewaters, shall be lined using high density polyethylene (HDPE) or similar synthetic liners.

…

9

10.1: [3M] shall properly operate and maintain the systems used to achieve permit compliance.

36. Per the 3M Industrial Stormwater Permit at Requirement 23.1 BMP Maintenance pursuant to Minnesota Rule 7090 and Requirement 23.2:

[3M] shall maintain all stormwater BMPs at the facility, to ensure BMP effectiveness.

…

b. If [3M] identifies BMPs that are not functioning properly, [3M] shall replace, maintain, or repair the BMPs within 7 calendar days of discovery. If [3M] cannot complete BMP replacement, maintenance, or repair within 7 calendar days, [3M] shall implement effective backup BMPs within 48 hours of discovery, and maintain the backup BMPs until [3M] restores the effectiveness of the original BMPs.

37. 3M's SWPPP, at Table 4-2, reflects "Good housekeeping" and "detention pond maintenance" as "Primary BMP's Implemented" regarding 3M's use of fire training chemicals at the Facility.

38. Per the SWPPP, "stormwater that has contacted significant materials should be managed and treated if necessary before it is discharged. [3M] will conduct its operations [at the Facility] in compliance with applicable environmental regulations and in a manner that is safe for its personnel, guests, and the community."

39. As the SWPPP states, the Facility ultimately discharges stormwater to the Mississippi River.

40. Per the SWPPP, the Facility is approximately 1,700 acres; roughly 7% of the site consists of impervious areas and ponds.

41. The Minnesota Industrial Stormwater Multi-Sector General Permit, attached as Appendix A to the 3M Industrial Stormwater Permit, provides that MPCA should

observe during its inspections of the sub-permittees, that "Stormwater detention ponds are properly maintained."

42.     3M also operates the facility subject to MPCA's Hazardous Waste Storage and Treatment Facility Permit ("Hazardous Waste Permit") for a hazardous waste incinerator facility uniquely identified as MND006172969, which was most recently reissued on June 28, 2012, with permit modifications on December 14, 2020 and August 11, 2023.

## FACTUAL BACKGROUND

43.     3M has manufactured PFAS, including but not limited to PFOS and PFOA and other products containing PFAS, during the history of its operations at the Facility.

44.     Beginning in the 1980s, the Facility has been the subject of Minnesota Environmental Responsibility and Liability Act (Minn. Stat. § 115B) because of contamination of hazardous and toxic trichloroethylene (TCE) and polychlorinated biphenyl (PCB) chemicals. A 1985 Consent Order applies to the Facility and response actions at the cite relating to these hazardous substances.

45.     Beginning in the mid-2000s, in response to widespread PFAS contamination originating from multiple 3M disposal sites, including the Facility, MPCA initiated MERLA actions to address the release of PFAS.

46.     In 2007, MPCA and 3M entered into a Settlement Agreement and Consent Order ("2007 SACO") that brought these sites into the Minn. Stat. § 115B framework and obligated 3M to undertake response actions necessary to address PFAS contamination at its disposal areas. The 2007 SACO required 3M to investigate the nature and extent of

11

PFAS contamination, to implement groundwater and soil remediation measures, and to undertake long-term environmental response actions consistent with MERLA's requirements.

47.    The 2007 SACO did not resolve or release 3M's liability for natural resource damages.

48.    PFAS releases from the Facility continued to migrate through groundwater and surface-water pathways even after the 2007 SACO.

49.    In 2009, MPCA adopted a "Minnesota Decision Document" pursuant to the 2007 SACO, which set forth numerous response actions that 3M needed to conduct related to PFAS contamination at the Facility and other 3M-related sites, including expanding and improving the existing groundwater extraction system and treating contaminated groundwater in the Facility's existing wastewater treatment plant prior to discharge.

50.    In 2010, the State brough a lawsuit for natural resource damages in Minnesota state courts relating to the 3M sites. That case was settled in February 2018. Among other relief, the February 2018 settlement required 3M to provide $850 million dollars to the state to, among other things, provide for clean drinking water in the east metro area impacted by PFAS pollution from the 3M sites.

51.    In 2020, 3M told MPCA that it was aware of a previously undisclosed discharge of chemical constituents from the Facility. These new disclosures relate to discharges that continue to this day.

52.    In response, MPCA issued two requests for information dated March 5, 2020, and July 1, 2020. 3M responded to the former on April 4, 2020 and the latter on a rolling basis thereafter.

53.    Based on the information received in response to those requests, MPCA issued a Notice of Violation to 3M on January 22, 2021, detailing several violations of 3M's permit conditions, regulatory rules, and federal and state statutes. A copy of the Notice of Violation is attached to this Complaint as **Exhibit A**.

54.    The Notice of Violation required, among other things, that 3M implement quarterly PFAS testing at five (5) existing benchmark monitoring locations ("BMLs").

55.    In July 2021, 3M retained Weston Solutions to prepare a work plan and conduct stormwater sampling at the Facility.

56.    Forty-seven (47) proposed internal sampling locations were identified, which, even though they may be characterized as "internal," discharge industrial wastewater or stormwater to either surface water or an unsaturated zone.

57.    Weston Solutions collected stormwater samples from the first thirty minutes of the start of a measurable stormwater discharge from a total of 36 out of 47 proposed sampling locations during four (4) sampling events. No samples were collected from the remaining eleven (11) locations due to a lack of flow/discharge.

a.    Weston Solutions collected samples from 28 sample locations during an August 26, 2021, rain event.

b.    Weston Solutions collected samples from 32 sample locations during a September 13, 2021, storm event.

13

c.    Weston Solutions collected samples from 31 sample locations during a September 20, 2021, storm event.

d.    Weston Solutions collected samples from 16 of 47 sample locations during an October 27-28, 2021, storm event.

58.    The samples Weston Solutions collected from these sampling events were sent to either Eurofins/Test America or 3M Environmental, Health, and Safety (EHS) laboratories for analysis.

59.    On January 18, 2022, MPCA requested results from the Weston Solutions sampling events from 3M by no later than February 1, 2022.

60.    3M submitted a report on February 22, 2022, titled "3M Cottage Grove Center (CGC) Stormwater Sampling & Analyses (Aug - Oct 2021)" (the "CGC Stormwater Report").

61.    At the time of the 2021 sampling events, the detected PFOS concentrations above the applicable site-specific water quality criteria for application in the Mississippi River, Pool 2, of 0.05 parts per trillion (ppt) at the Facility at locations reflected on the CGC Report **A**, and determined by MPCA to present a likelihood of discharging to surface waters or the unsaturated zone were:

a.    AB-01 (September 20, 2021: 310,000 ppt)

b.    AG-02 (Average August-October 2021: 17,010 ppt)

c.    3U-01 (Average August-October 2021: 5,770 ppt)

d.    3T-01 (Average August-October 2021: 3,700 ppt)

e.    2L-01 (Average August-October 2021: 1,700 ppt)

14

f.      AR / BML 002 (Average Q1 2021-Q1 2022 Concentration: 407 ppt)

g.      AB-03 (Average August-October 2021: 167 ppt)

h.      AG-01 (Average August-October 2021: 119 ppt)

i.      1AI-01 (Average August-October 2021: 78 ppt)

j.      3J-01 (Average August-October 2021: 34,000 ppt)

k.      3AL-02 (Average August-October 2021: 20,275 ppt)

l.      3AL-01 (Average August-October 2021: 14,333 ppt)

m.      3Y01 (September 20, 2021: 4,100 ppt)

n.      AD03 (Average August-October 2021: 3,800 ppt)

o.      2I04 (Average August-October 2021: 3,485 ppt)

p.      2I02 (Average August-October 2021: 2,033 ppt)

q.      2I01 (Average August-October 2021: 1,850 ppt)

r.      3Z01 (Average August-October 2021: 1,593 ppt)

s.      2I01 (Average August-October 2021: 1,517 ppt)

t.      3Z02 (Average August-October 2021: 1,093 ppt)

u.      3AL03 (Average August-October 2021: 995 ppt)

v.      AD02 (Average August-October 2021: 650 ppt)

w.      AB05 (Average August-October 2021: 620 ppt)

x.      3V01 (Average August-October 2021: 615 ppt)

y.      3R01 (Average August-October 2021: 460 ppt)

z.      3AL04 (September 13, 2021: 450 ppt)

aa.     3R02 (Average August-October 2021: 420 ppt)

bb.    2I03 (Average August-October 2021: 320 ppt)

cc.    2AA01 (Average August-October 2021: 290 ppt)

dd.    3W01 (Average August-October 2021: 143 ppt)

ee.    AB04 (Average August-October 2021: 102 ppt)

ff.    1G01 (Average August-October 2021: 91 ppt)

gg.    3X02 (Average August-October 2021: 66 ppt)

hh.    3X01 (Average August-October 2021: 36 ppt)

62.    Per the CGC Stormwater Report, the sample with the highest total concentration of PFAS was location "AB-01" with a total concentration of 1,434,000 parts per trillion (ppt). Location AB-01 also had the highest PFOS concentration of 310,000 ppt.

63.    Location AB-01 is an internal sampling location that does not routinely discharge to surface waters; however, a heavy rainfall event (4+"/24 hrs.) will cause location AB-01 to discharge direct to surface waters. Otherwise, location AB-01 discharges to the unsaturated zone near the Mississippi River.

64.    Per the CGC Stormwater Report, sixteen (16) on-site internal sample locations had average PFOS concentrations greater than 1,000 ppt.

65.    The CGC Stormwater Report included laboratory analytic results reported by Eurofins/Test America; the CGC Stormwater Report did not include analytic results from the 3M EHS laboratory.

16

66. On March 7, 2022, MPCA requested additional information from 3M concerning the Weston Solutions sampling results, including the analytical results reported by the 3M EHS laboratory.

67. Responding to MPCA's March 7 request, on March 14, 2022, 3M provided that the "final laboratory analytical report from [the] 3M EHS laboratory is anticipated to be completed on April 29, 2022."

68. On April 29, 2022, MPCA requested an update from 3M concerning the 3M EHS laboratory analytical results and 3M indicated that the results were not yet ready for distribution.

69. On June 28, 2022, MPCA received the 3M EHS laboratory analytical results from the August through October 2021 sampling events conducted by Weston Solutions.

70. Each instance of discharge of PFAS, including PFOS, to the locations reflected on the CGC Report, and determined by MPCA to discharge to surface waters or the unsaturated zone, with PFOS concentrations above the applicable site-specific water quality criteria for application in the Mississippi River, Pool 2, of 0.05 parts per trillion (ppt), constitutes a violation of Minnesota Rules Part 7050.0210, subpart 2, Minnesota Rules Part 7050.0210, subpart 13, and/or Minnesota Rules Part 7060.0600, subpart 2. The State has also adopted site-specific water quality standards for river miles 820 to 812 for PFOA, PFHxS, PFBS, and PFBA.

71. MPCA conducted water quality inspections at the Facility in September 2021 and October 2022.

17

72.    During both the September 2021 and October 2022 water quality inspections, MPCA staff observed and documented that 3M failed to properly operate and maintain its fire training area synthetically lined pond per applicable stormwater Best Management Practices (BMPs), in violation of the 3M Industrial Stormwater Permit Chapter 1, Part 1, subpart 1.14; Chapter 1, Part 10, subpart 10.1; and Requirement 23.1 BMP Maintenance pursuant to Minnesota Rules Part 7090, and Requirement 23.2.

73.    Specifically, 3M allowed a tree to grow through and perforate the liner, damaging its integrity, along with numerous areas where the liner had deteriorated to a point where water could be released into the environment.

74.    On December 14, 2022, MPCA issued an Administrative Order to 3M pursuant to Minn. Stat. 115.03. The Administrative Order required 3M to take certain remedial actions to address PFAS discharges from the Cottage Grove site. A copy of the Administrative Order is attached to this Complaint as **Exhibit B**.

75.    In the Administrative Order, MPCA determined that stormwater discharges from the Facility contained PFAS, including PFOS, at concentrations far exceeding applicable state water-quality criteria and were being released to surface waters and the unsaturated zone in violation of state law and the Facility's NPDES/SDS permits.

76.    The Administrative Order was based on extensive PFAS contamination documented across dozens of internal stormwater sampling locations, including PFOS concentrations as high as 310,000 ppt at location AB-01 and tens of thousands of ppt at numerous other locations.

77. MPCA also found that stormwater at the Facility ultimately discharges to the Mississippi River, including Pool 2, which is impaired for PFOS and subject to a fish-consumption advisory due to PFOS contamination.

78. In the Administrative Order, MPCA required 3M to implement the September 2022 Interim Remedial Measures ("IRMs") Workplan prepared by Weston Solutions.

79. The Administrative Order thus required installation of stormwater collection and treatment systems at eleven first-priority sampling locations, each with demonstrated potential to discharge PFOS-contaminated stormwater to surface waters or the unsaturated zone. These systems must remain in place until stormwater at these locations achieves PFOS concentrations at or below 0.05 ppt for surface-water pathways or 15 ppt for unsaturated-zone pathways, with treatment technology capable of achieving non-detect results at reporting limits no higher than 4 ppt.

80. The Administrative Order also required similar corrective measures at seven second-priority locations and mandates that all remaining industrial-activity outfalls achieve compliance with PFOS criteria no later than August 1, 2023.

81. The Administrative Order further required 3M to restore the Facility's fire-training stormwater pond, which MPCA determined had a perforated and deteriorated liner that allowed stormwater containing PFAS to be released into the environment. 3M was required to assess the pond's condition, submit a restoration plan, and remove accumulated stormwater until full design capacity has been restored.

82.    The Administrative Order further required 3M to prepare and submit a comprehensive Stormwater Action Plan. The Plan was to incorporate all required remedial measures; identify specific treatment methods—including granular activated carbon, subsurface capture systems, haul-away treatment, and additional stormwater basins; and include monthly inspections, PFAS breakthrough monitoring procedures, operation and maintenance requirements, and a schedule for sampling, inspections, and photographic documentation. The Plan must also require quarterly stormwater sampling for a broad suite of PFAS compounds—over forty, including PFOS, PFHxS, PFBS, PFOA, PFNA, PFDA, GenX, and others—using the minimum reporting levels available, and must include annual certification that 3M is monitoring all PFAS reasonably believed to be present.

83.    The Administrative Order imposed additional wastewater-treatment requirements, including maintaining PFOS concentrations below 7 ng/L (monthly average) and 14 ng/L (daily maximum) at the Facility's SD001 and SD002 monitoring locations as intervention limits. If an intervention limit is exceeded, 3M must immediately resample, evaluate the cause and significance of the exceedance, and implement corrective actions, including accelerated carbon change-outs and installation of additional GAC units. A Discharge Evaluation Report must accompany the next monthly DMR following any exceedance.

84.    The Administrative Order also required 3M to conduct a PFAS Treatability Alternative Identification Plan and subsequent Treatability Study to evaluate feasible long-term PFAS-treatment technologies for the Facility's wastewater. Technologies to be

20

evaluated include reverse osmosis and other dissolved-phase and sorption-based systems. 3M must provide periodic progress updates and, upon completion of the Treatability Study, submit full engineering plans and specifications for MPCA approval, together with an operations and maintenance plan demonstrating how PFAS discharge limits will be met.

85.    The Administrative Order also required 3M to conduct an instream PFAS characterization study—sampling surface water, surface microlayer, pore water, sediment, fish, and benthic macroinvertebrates—and to submit quarterly progress reports detailing PFAS sampling results, stormwater volumes discharged or treated, and status of required remedial measures.

86.    The Order states that MPCA reserves full enforcement authority and may take additional actions, including seeking further penalties and injunctive relief.

87.    Administrative Order also required 3M to submit a complete NPDES/SDS permit application reflecting all PFAS discharged from the Facility and all PFAS monitoring, treatment, and operational changes mandated by the Order. The MPCA determined that 3M's existing permit did not account for numerous PFAS compounds present in the Facility's wastewater and stormwater, nor did it include the PFAS-specific controls and treatment systems required under the Order, and therefore directed 3M to file a new permit application.

88.    3M submitted a new NPDES/SDS permit application for the Cottage Grove site in early 2024. The draft permit was published for public comment on July 1, 2024 and a final permit was issued on June 1, 2025. The final permit includes several conditions

21

dedicated to monitoring for PFAS and preventing PFAS from migrating off site, many of which pick up on the requirements from the Notice of Violation and Administrative Order.

89.    3M has completed some of the work required under the Notice of Violation and Administrative Order documents, but the work remains incomplete and PFAS continues to release into the environment from the Facility.

90.    For example, Solid Waste Management Unit 15 – Disposal Area D8 identified in the Hazardous Waste Permit, is on a hillside adjacent to stormwater outfall AB-01. This area was used to dispose drummed waste consisting of set-up resins and some solidified or granular pigments. Approximately 200 surficial and partially buried containers and/or container fragments were removed from the D8 area but other drums were not removed.  Those remaining drums were covered with fill and the D8 area continues to release PFAS into the environment to the present day.

91.    3M also has not completed a groundwater extraction system and the current network is insufficient to stop PFAS-contaminated groundwater from migrating off-site. This includes production wells PW-33 and PW-37, which were installed in October 2019 but are not currently operating. 3M has informed MPCA that it anticipates the need to construct and operate up to four additional wells to prevent off-site migration of groundwater from beneath the former disposal areas, an area known as the "East Cove," and the wastewater treatment plant area.

92.    3M has reported that the groundwater extraction system does not completely prevent PFAS-contaminated groundwater from leaving the southern boundary between 3M's Cottage Grove site and discharging to the Mississippi River. While PFAS

22

compounds have already damaged the environment once they reach groundwater, this extraction well system is intended to prevent PFAS-contaminated groundwater from spreading off-site or into surface water bodies and causing further harm.

93.    In short, 3M has violated Minnesota statutes and permits, and its actions present an on-going and continuous harm to Minnesota's environment and threat to Minnesotans.

## COUNTS

### COUNT I: VIOLATIONS OF PERMIT CONDITIONS, STATE RULES, STATE STATUTE, OR FEDERAL STATUTE ENFORCEABLE BY THE STATE

94.    Plaintiff re alleges all preceding paragraphs and all alleged violations in the Notice of Violation attached as Exhibit A.

95.    Each instance of each violation alleged herein and in the NOV, in which 3M was, or is, in violation of the respective permit condition, state rule, state statute, or federal statute enforceable by the state, is actionable in this Complaint. These violations include but are not limited to the following summaries:

96.    Minnesota Rules Part 7001.1030, subpart 1: permit required. 3M violated this Rule on each day of discharge of PFAS compounds at each outfall because 3M did not have a permit to discharge PFAS from any outfall, the precise number of days of occurrence to be determined at trial.

97.    Permit Conditions 4.13.1, 4.13.2: permit modifications for changes to facility. 3M violated these Conditions on each day it discharged perfluropropionic acid (PFPA), perfluorobutanesulfinic acid (PFBSi), trifluoroacetic acid (TFA), lithium

23

bis(trifluoromethylsulfonyl)imide (TFSI) and trifluoromethane sulfonate (TFMS) because it did not have a permit modification allowing for discharge of any of these PFAS compounds.

98. Permit Condition 4.22.1 and 40 C.F.R. § 122.41: complying with permit application regulations. 3M violated this Condition when applying for reissuance of Permit #MN001449 in 2007 by failing to disclose its knowledge that the following compounds were present in its discharge to waters of the state: perfluropropionic acid (PFPA) and perfluorobutanesulfinic acid (PFBSi); trifluoroacetic acid (TFA); TFSI; trifluoromethane sulfonate (TFMS) lithium salt; and TFMS. 3M violated these Conditions on each day it discharged these substances, the precise number of days of occurrence to be determined at trial.

99. Permit Conditions 4.10.1, 4.10.2, 4.3.4, and 4.13.1: system operation and maintenance, reliability, discharge monitoring, and permit modifications (pH adjustment). 3M violated these Conditions because the Permit required 3M to use a pH adjustment system to ensure permit compliancebut 3M discontinued using the pH adjustment system in or about 2017 and failed to seek a permit modification for doing so. 3M's violation existed on each day in which the pH system was not operated or was not operated reliably, the precise number of days of occurrence to be determined at trial.

100. Permit Conditions 4.10.1, 4.10.2, and 1.1.1: no discharge of wastewater (SD003). 3M violated these Permit Conditions on each day that 3M allowed the discharge of untreated wastewater or spills from its stormwater pond to the SD003 outfall, including

24

each event listed in the Notice of Violation, the precise number of days of occurrence to be determined at trial.

101.    Permit Conditions 4.10.1, 4.10.2, and 1.1.1: no discharge of wastewater (SD003). 3M violated this Permit Condition on each day that 3M allowed a tree to perforate the liner of the fire training area holding pond, and allowed the liner to degrade in other areas that would allow contaminated water to escape, the precise number of days of occurrence to be determined at trial.

102.    Permit Condition 4.6.2 and Minn. Stat. § 115.061: failure to notify. 3M violated this Condition on each day it failed to notify MPCA of releases, including each event listed in the Notice of Violation, the precise number of days of occurrence to be determined at trial.

103.    Permit Conditions 4.2.7, 4.3.1, and 4.6.3 (reporting spills). 3M violated these Conditions for at least 353 days after a spill event at outfall SD003 leading to a foaming event, during which it did not report its sampling results to MPCA. The precise number of days of occurrence will be determined at trial.

104. Permit Condition 1.3.1 and Minnesota Rules Part 7050.0210, subpart 2: nuisance conditions prohibited. 3M violated this Condition and Minnesota Rule on each day of each outfall's discharge of PFAS compounds to surface water discharging to any water of the state, including the Mississippi River, causing nuisance conditions as detailed in the Notice of Violation, the precise number of days of occurrence to be determined at trial.

25

105. Permit Condition 2.2.2 and 40 C.F.R. § 136.3: sampling and testing procedures. 3M violated this Condition and Federal Regulation on each day that it failed to properly calibrate its pH meter, including at least two years as detailed in the Notice of Violation, the precise number of days of occurrence to be determined at trial.

106. Permit Conditions 4.3.1, 4.6.3, 4.4.1, 4.2.2, and 40 C.F.R. § 136.3: sampling and test procedures. 3M violated these Permit Conditions and Federal Regulation on each day its samples did not conform with temperatures or holding times, the precise number of days of occurrence to be determined at trial.

107. Permit limits and reporting requirements. 3M violated these Permit requirements when it failed to comply with the permit-required minimum sampling frequency of 2x/month for the five parameters. The precise number of days of occurrence to be determined at trial.

108. Permit Condition 1.1.12: testing for fluorochemicals. 3M violated this Permit Condition when it failed to analyze all of its monthly fluorochemical/PFAS analyses to the minimum detection levels available, the precise number of days of occurrence to be determined at trial.

109. Minnesota Rules Part 7060.0600, subpart 2: prohibition against discharge into unsaturated zone. 3M violated this Rule on each day of each outfall's discharge of PFAS compounds to the unsaturated zone, the precise number of days of occurrence to be determined at trial.

110. Minnesota Rules Parts 7045.0205 and 7045.0458: waste analysis requirements. 3M violated these Rules on each day it failed to repeat analyses as necessary

26

to ensure accuracy of its hazardous-waste characterization, including failing to verify approximately 1,700 active hazardous-waste streams at the Facility since at least January 2015. 3M's violation existed on each day these streams were accepted or treated without required verification, the precise number of days of occurrence to be determined at trial.

111. Facility Hazardous Waste Permit and Minn. R. 7045.0454: pre-acceptance waste determinations. 3M violated these requirements by accepting and managing Discotherm Tar wastes based on inaccurate or incomplete pre-acceptance documentation, including underreporting hydrofluoric acid (HF) content by as much as 29.9 percent. Each day 3M accepted or treated this waste without accurate determination constituted a violation, the precise number of days to be determined at trial

112. Minnesota Rules Parts 7045.0474 and 7045.0478: generator knowledge and verification. 3M violated these Rules on each day it failed to require non-3M waste generators to supply quarterly analytical data, and on each day it failed to conduct required independent verification analyses for major waste streams. These failures occurred on numerous occasions between 2015 and 2020. The precise number of days will be determined at trial.

113. Facility Hazardous Waste Permit: verification of major waste streams. 3M violated its Permit and applicable rules by failing to perform weekly verification analyses for the Facility's major waste streams in 2015, 2019, and 2020, as required. Each week in which verification did not occur constituted a separate violation, the precise number of weeks to be determined at trial.

27

114. Minnesota Rules Parts 7045.0202 and 7045.0552: quality assurance and quality control (QA/QC). 3M violated these Rules on each day that it used laboratory methods for hazardous-waste determinations that contained sample-preparation, calibration, or recordkeeping deficiencies, including documented issues affecting the reliability of XRF and ICP–OES data since at least 2015. Each day 3M generated or relied upon inaccurate data constituted a violation, the precise number of days to be determined at trial.

115. Minnesota Rules Parts 7045.0630–7045.0645: container management and storage of hazardous waste. 3M violated these Rules by storing hazardous-waste containers in unapproved areas of the Facility on multiple occasions between 2017 and 2020, and by failing to maintain container integrity and compliance with required management standards. Each day such containers remained in unapproved locations constituted a violation, the precise number of days to be determined at trial

116. Minnesota Rules Part 7045.0304 and Permit Conditions: one-year storage limit. 3M violated hazardous-waste storage requirements by storing hundreds of restricted wastes for periods exceeding one year without proper justification or treatment, in violation of the one-year accumulation limit. Each day the affected containers remained onsite beyond one year constituted a violation, the precise number of days to be determined at trial.

117. Minnesota Rules Part 7045.0208: marking and labeling of hazardous-waste containers. 3M violated these Rules on each day containers were not labeled "Hazardous Waste" or were labeled inaccurately, including multiple incidents between 2017 and 2020.

28

Each day each container lacked compliant labeling constituted a violation, the precise number of days to be determined at trial.

118. Minnesota Rules Part 7045.0292: manifest discrepancies. 3M violated this Rule when it failed to immediately notify the Commissioner of major discrepancies between waste manifests and quantities or characteristics received, and when it misclassified certain hazardous-waste shipments as non-hazardous in manifest documentation. Each discrepancy constituted a violation, the precise number of days to be determined at trial.

119. Minnesota Rules Part 7045.0121: hazardous-waste determinations. 3M violated this Rule by inaccurately determining that several incoming waste profiles were non-hazardous when analytical data later showed they met criteria for hazardous waste. Each incorrect determination constituted a violation, the precise number of days to be determined at trial.

120. Minnesota Rules Part 7045.0562: preparedness and prevention. 3M violated this Rule by failing to ensure proper segregation, safe handling, and emergency preparedness measures for hazardous-waste storage areas, as evidenced by storage in non-approved container areas and incomplete documentation of emergency procedures. Each day such conditions persisted constituted a violation, the precise number of days to be determined at trial.

121. Minnesota Rules Part 7045.0556: required inspection and maintenance. 3M violated this Rule on each day it failed to maintain adequate inspections of container storage areas or to correct deficiencies identified in its hazardous-waste management

29

systems, including missing labeling, container condition issues, and documentation gaps identified by MPCA. The precise number of days will be determined at trial.

## COUNT II: ENFORCEMENT OF ADMINISTRATIVE ORDER AND STATE WATER QUALITY LAWS PURSUANT TO MINN. STAT. § 115.071

122.  Plaintiff re alleges all preceding paragraphs.

123.  MPCA issued the Administrative Order after determining that stormwater and wastewater discharges from the Facility contained PFOS and other PFAS at levels far exceeding applicable standards, and that such discharges were reaching surface waters and the unsaturated zone in violation of Minnesota law and the Facility's NPDES/SDS permit. The Administrative Order found extensive PFAS contamination throughout the Facility's industrial and stormwater discharges, including PFOS concentrations as high as 310,000 ppt at sampling location AB-01, and documented failures in stormwater infrastructure such as the deteriorated fire training pond liner.

124.  By allowing a tree to grow through and perforate the liner, damaging its integrity, along with numerous areas where the liner had deteriorated to a point where water could be released to the environment depending on the accumulated water level in the pond, 3M failed to properly operate and maintain its fire training area synthetically lined pond per applicable stormwater Best Management Practices (BMPs), in violation of the 3M Industrial Stormwater Permit Chapter 1, Part 1, subpart 1.14; Chapter 1, Part 10, subpart 10.1; and Requirement 23.1 BMP Maintenance pursuant to Minnesota Rules Part 7090, and Requirement 23.2.

30

125. The Administrative Order requires 3M to undertake extensive remedial measures, including: implementation of the September 2022 Interim Remedial Measures Workplan; treatment of stormwater at eleven first priority and seven second priority sampling; elimination of PFOS exceedances from all industrial activity outfalls; and implementation of the comprehensive Stormwater Action Plan including monthly inspections, PFAS breakthrough monitoring, operation and maintenance procedures, and quarterly sampling for more than forty PFAS compounds, along with annual certification.

126. The Administrative Order remains in full force and effect, and remedial work under the Order continues.

127. 3M has not completed the remedial action obligations that the Administrative Order requires.

128. Unless and until 3M completes all necessary remedial actions under the Administrative Order,[1] the Facility will continue to discharge PFAS into the environment.

**COUNT III: ENFORCEMENT OF MERLA FOR THE RELEASE AND THREATENED RELEASE OF HAZARDOUS SUBSTANCES PURSUANT TO MINN. STAT. § 115B**

129. MPCA re-alleges the preceding paragraphs of this Complaint.

130. PFAS compounds constitute "hazardous substances," "pollutants," or "contaminants" within the meaning of Minn. Stat. § 115B.

---

[1] The Administrative Order addresses stormwater and wastewater, but there are other areas on-site subject to ongoing work under a separate Resource Conservation and Recovery Act (RCRA) Treatment, Storage, and Disposal Facility (TSDF) permit. There will continue to be discharges into the environment until the RCRA-TSDF permit is terminated and Superfund actions are complete.

31

131. The Facility's past of PFAS to the environment from the Facility constitutes a release of a hazardous substance under MERLA. Minn. Stat. § 115B.

132. The Facility's ongoing discharge of PFAS to the environment from the Facility constitutes a release of a hazardous substance under MERLA, and relatedly presents the threatened release of hazardous substances in the future which is also governed by MERLA. Minn. Stat. § 115B.

133. MERLA authorizes MPCA to require all response actions necessary to protect public health or the environment from releases of hazardous substances and to pursue all corresponding relief available under MERLA, Minn. Stat. § 115B, in addition to the remedies provided under Minn. Stat. § 115.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff State of Minnesota, by its Pollution Control Agency, requests judgment from this Court in its favor and against Defendant in excess of Fifty Thousand Dollars ($50,000), plus interest, to the full extent permitted by statute, plus such costs and fees as the Court deems just and reasonable. These include:

134. Minnesota Statute § 115.071 provides broad authority for the State to bring a civil action to enforce Chapters 115 and 116, and all rules, orders, and permits including actions for civil penalties, injunctive relief, to compel performance, and other appropriate action. Accordingly, the State is entitled to a judicial order:

135. Ordering 3M to comply fully with all obligations, schedules, and conditions imposed by the Administrative Order in the form of specific performance, *see e.g.* Minn. Stat. § 115.071, subd. 5.

136.   Ordering 3M to perform any and all acts and things within the defendant's power which are reasonably necessary to accomplish the purposes of the Administrative Order and to protect waters of the state and other natural resources from further harm; *see id.*

137.   Enjoining any conduct inconsistent with the Administrative Order or resulting in the improper discharge of PFAS compounds from the Facility into the environment; *see e.g.* Minn. Stat. 115.071, subd. 4;

138.   Enjoining 3M from creating additional nuisance conditions or discharges and ordering 3M to abate and remove the pollution and nuisance; *see e.g.* Minn. Stat. 115.071, subd. 4-5 and Minn. R. 7050.0210.

139.   For each separate and unique violation of the permit conditions, Minnesota Rules part 7050.0210 and its subparts, state statutes and federal authorities, that 3M forfeit civil penalties under Minn. Stat. § 115.07, subd. 3 in the amount of up to $30,000 per violation per day, the total amount to be determined at trial.

140.   That 3M forfeit and pay to the State funds sufficient to reimburse MPCA for its reasonable costs in responding to each of the state water quality incidents detailed herein and as allowed by Minn. Stat. § 115.071, subd. 3(b)(1).

141.   That 3M forfeit and pay to the State an additional sum to constitute just compensation for any loss or destruction to wildlife, fish or other aquatic life and for other actual damages to the state caused by an unauthorized discharge of pollutants as allowed by Minn. Stat. § 115.071, subd. 3(b)(2).

142. That 3M be subject to a continuing injunction requiring it to monitor for, and address, ongoing violations as allowed by Minn. Stat. § 115.071, subd. 4, the specific terms to be developed during this case.

143. Under Minn. Stat. § 115B.04, subd. 1, 3M is strictly liable for response costs and damages for the release or threatened release of a hazardous substance from the Facility. This includes all reasonable and necessary response costs incurred by the state, all reasonable and necessary removal costs incurred by any person; and all damages for any injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss. Accordingly, the State is entitled to a judicial order:

144. Declaring that 3M is strictly liable for the release or threatened release of PFAS, a hazardous substance, from the Facility.

145. Awarding the State its response costs and/or reasonable expenses and a declaratory judgment of liability for all future reasonable and necessary costs or expenses incurred by the State to respond to the release or threatened release. 115B.11, subd. 2; 115B.17, subd. 6.

146.    All other remedies available to the State under Chapter 115B, including damages pursuant to Minn. Stat. § 115B.17 and costs, disbursements and reasonable attorney fees and witness fees under Minn. Stat. § 115B.14.

Dated: April 3, 2026                          KEITH ELLISON
                                              Attorney General
                                              State of Minnesota


                                              Peter N. Surdo
                                              Special Assistant Attorney General
                                              Atty. Reg. No. #339015

                                              445 Minnesota Street, Suite 600
                                              St. Paul, Minnesota 55101-2127
                                              (651) 300-6637 (Voice)
                                              peter.surdo@ag.state.mn.us

                                              ATTORNEY FOR THE STATE OF
                                              MINNESOTA, BY ITS MINNESOTA
                                              POLLUTION CONTROL AGENCY

## MINN. STAT. § 549.211 ACKNOWLEDGEMENT

The party on whose behalf the attached document is served acknowledges through its undersigned counsel that sanctions, including reasonable attorney fees and other expenses, may be awarded to the opposite party or parties pursuant to Minn. Stat. § 549.211.

Dated: April 3, 2026

_____

Peter N. Surdo
Special Assistant Attorney General
Atty. Reg. No. #339015

36

**State of Minnesota**

| | | |
|---|---|---|
| **District Court** | | |

| County | | Judicial District: | Tenth |
|---|---|---|---|
| Washington | | Court File Number: | TBD |
| | | Case Type: | Civil - Complex |

State of Minnesota, by and through Minnesota
Pollution Control Agency
Plaintiff

vs

3M Company and
3M Chemical Operations LLC

Defendant**s**

**Civil Summons**

This Summons is directed to (name of Defendant):

 3M Company and 3M Chemical Operations LLC                                    .

1.      **You are being sued**. The Plaintiff has started a lawsuit against you. The *Complaint* is attached to this *Summons*. Do not throw these papers away. They are official papers that start a lawsuit and affect your legal rights, even if nothing has been filed with the court and even if there is no court file number on this *Summons*.

2.      **You must BOTH reply, in writing, AND get a copy of your reply to the person/business who is suing you within 21 days to protect your rights.** Your reply is called an *Answer*.  Getting your reply to the Plaintiff is called service.You must serve a copy of your *Answer or Answer and Counterclaim* (Answer) within 21 days from the date you received the *Summons* and *Complaint*.

        ANSWER: You can find the *Answer* form and instructions on the MN Judicial Branch website at www.mncourts.gov/forms under the "Civil" category.  The instructions will explain in detail how to fill out the *Answer* form.

3.      **You must respond to each claim.**  The *Answer* is your written response to the Plaintiff's *Complaint*. In your *Answer* you must state whether you agree or disagree with each paragraph of the *Complaint*. If you think the Plaintiff should not be given everything they asked for in the *Complaint*, you must say that in your *Answer*.

4.      SERVICE: **You may lose your case if you do not send a written response to the Plaintiff.** If you do not serve a written *Answer* within 21 days, you may lose this case by default.

You will not get to tell your side of the story. If you choose not to respond, the Plaintiff may be awarded everything they asked for in their *Complaint*. If you agree with the claims stated in the *Complaint*, you don't need to respond. A default judgment can than be entered against you for what the Plaintiff asked for in the *Complaint*.

To protect your rights, you must serve a copy of your *Answer* on the person who signed this *Summons* in person or by mail at this address:

_____ .

5.      Carefully read the Instructions (CIV301) for the *Answer* for your next steps.

6.      **Legal Assistance.** You may wish to get legal help from an attorney. If you do not have an attorney and would like legal help:

- Visit www.mncourts.gov/selfhelp and click on the "Legal Advice Clinics" tab to get more information about legal clinics in each Minnesota county.

- Court Administration may have information about places where you can get legal assistance.

**NOTE: Even if you cannot get legal help, you must still serve a written *Answer* to protect your rights or you may lose the case.**

7.      **Alternative Dispute Resolution (ADR).** The parties may agree to or be ordered to participate in an ADR process under Rule 114 of the Minnesota Rules of Practice. You must still serve your written *Answer,* even if you expect to use ADR.

April 3, 2026
_____
Date

_____
Signature

Name: _____ Peter N. Surdo _____

Address: _____ 445 Minnesota Street _____

City, State, Zip: _____ Saint Paul, MN 55101 _____

Telephone: _____ 651-300-6637 _____

E-mail: _____ peter.surdo@ag.state.mn.us _____